IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| AQUA CONNECT, INC., a Nevada corporation, and STRATEGIC TECHNOLOGY PARTNERS, LLC, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>PARALLELS INC., Delaware corporation,<br><br>Defendant, | Civil Action No. 1:18-cv-00454-VAC-MPT<br><br>JURY TRIAL DEMANDED |

**DEFENDANT PARALLELS INC.'S ANSWER AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Parallels Inc. ("Parallels") hereby files its Answer to Plaintiffs Aqua Connect, Inc. ("Aqua Connect") and Strategic Technology Partners, LLC's ("STP," collectively, "Plaintiffs") Complaint for Patent Infringement ("Complaint"). Parallels denies the allegations and characterizations in Plaintiffs' Complaint unless expressly admitted in the following paragraphs.

**BACKGROUND**

**Paragraph No. 1:** Plaintiffs are the assignees of all right, title, and interest in and to U.S. Patent No. RE46,386, entitled "Updating a user session in a Mach-derived computer system environment" ("the '386 Patent," attached as Exhibit A), and U.S. Patent No. 8,924,502, entitled "System, method and computer program product for updating a user session in a Mach-derived system environment" ("the '502 Patent," attached as Exhibit B), (collectively, the "Patents-in-Suit"). Plaintiffs have the exclusive right to assert all causes of action arising under the Patents-in-Suit and the right to remedies for infringement thereof.

**Answer to Paragraph No. 1:** Parallels admits that a copy of what purports to be a copy of the ‘386 and ‘502 Patents are attached as Exhibits A and B, respectively, to the Complaint. Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 1, and therefore denies the same.

**Paragraph No. 2:** The inventor on the Patents-in-Suit is Joseph Cohen. At age 14, Mr. Cohen became the youngest person to achieve a Certified NetWare Engineer (CNE) degree in the history of computing, the previous person being 20 years old. He also became the youngest member of the Network Professional Association (NPA), at age 14. At age 15 he received a Microsoft Certified Professional (MCP) certification, and then a Microsoft Certified Systems Engineer (MCSE) certification at the age of 15. He was the youngest person to achieve four industry standard accreditations at the time by two separate standards setting organizations. He received personal letters from President Clinton, and became the Vice-President of the Los Angeles chapter of the Network Professional Association where he helped to oversee the largest growth of members in the organization’s history.

**Answer to Paragraph No. 2:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2, and therefore denies the same.

**Paragraph No. 3:** The claims of the Patents-in-Suit are patent eligible and are directed to a specific improvement in technology and not an abstract idea. For example, the claims improve the way computer systems operate, improving the ability of Mach-derived systems to be viewed and controlled by users remotely over a network. In addition, the claims solve technological problems with prior art remote desktop solutions, and claim improvements consisting of specific technological solutions. One aspect of these solutions is using a specific new system architecture for transmitting data between different processes running on separate parts of a Mach-derived

system: an “agent client” in one Mach context and an associated “agent server” in a separate Mach context, which communicate with each other over a system communication facility.

**Answer to Paragraph No. 3:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and therefore denies the same.

**Paragraph No. 4:** This architecture—agent client in one context and agent server in a separate context—improved communication in and out of user contexts on computer systems. More specifically, it allowed improved access and control of the user interface of the Mach-derived system from a remote computer over a network.

**Answer to Paragraph No. 4:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4, and therefore denies the same.

**Paragraph No. 5:** In 2007, inventor Joseph Cohen realized that instead of following the conventional wisdom to have a single remote desktop task in a single context, he could split up the functions carried out by a remote desktop application into two separate but associated tasks in two separate Mach contexts: for example, one in the user context (which he called the “agent server”), and the other in the system context (which he called the “agent client”).

**Answer to Paragraph No. 5:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5, and therefore denies the same.

**Paragraph No. 6:** Mr. Cohen’s invention went against conventional wisdom, which taught that functions should not be split up across multiple tasks (which are expensive resources), especially when they need to pass large amounts of data among them.

**Answer to Paragraph No. 6:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6, and therefore denies the same.

**Paragraph No. 7:** Mr. Cohen's invention had several benefits. For example, it allowed a user session that was being controlled by a user on a remote computer to run in the background on the host computer, as opposed to being displayed on the local screen of the host computer. It enabled multi-user terminal server functionality. Because the agent client remained in the system context and could communicate with an agent server in a user context, any number of users could connect to the agent client and log in, at which point a new agent server for just that user would be created and would interact with the agent client. Using the agent server as an intermediary allowed the terminal server application to efficiently manage the network connection, for example, by prioritizing connections that are time sensitive. Because this solution allowed for true isolation of user tasks within a user context and did not require access to user tasks from the system context, the data of each terminal server user was more secure than regular multi-user functionality.

**Answer to Paragraph No. 7:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7, and therefore denies the same.

**Paragraph No. 8:** The inventions claimed in the Patents-in-Suit solved problems associated with conventional prior art remote desktop applications. For example, conventional remote desktop applications exposed the user context directly to the network and therefore to the possibility of malicious code accessing the user context. Conventional applications also did not allow a second user to connect and start up his or her own session with its own context, which created a long felt need in the Mach-based terminal server solution market. Such conventional solutions also did not allow a user to connect to a computer using his or her own credentials if another user was logged in on the host computer, even if that other user was not using the computer at the time. Conventional solutions also failed to allow a remote user session to run in

the background on the host computer. For example, if a user was controlling the user interface remotely, that user interface would also be displayed on the locally connected display of the host computer. As another example, conventional solutions required establishing, tearing down, and then re-establishing a connection with the remote computer, which required additional system resources and led to delays and connectivity issues. These are only examples of how the inventions claimed in the Patents-in-Suit were unconventional.

**Answer to Paragraph No. 8:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8, and therefore denies the same.

**Paragraph No. 9:** Each claim also recites unconventional technical steps. For example, the claims recite a technical solution to a technical problem: a software architecture for transferring data in and out of separate Mach contexts and over a network to a remote computer to update the user interface and control the host computer consisting of: (1) an agent client in one Mach context; and (2) at least one agent server in a separate Mach context, which is associated with the agent server in a way that allows data to be transferred between the two. This combination of components and steps as well as each individual component or step itself was unconventional because the conventional solutions used a single task in the user context, not two associated tasks in different contexts. Each claim recites additional unconventional technical steps, each of which is independently sufficient to confer patent-eligibility.

**Answer to Paragraph No. 9:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9, and therefore denies the same.

**Paragraph No. 10:** In addition, during prosecution of the '386 Patent, the Examiner expressly found that the claims were patent eligible under the standard set forth in *Alice*.

**Answer to Paragraph No. 10:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10, and therefore denies the same.

**PARTIES**

**Paragraph No. 11:** Aqua Connect, Inc. is a Nevada corporation with a principal place of business and headquarters is at 18801 Ventura Blvd., Suite 310, Tarzana, CA 91356. Aqua Connect is the exclusive licensee of the asserted patents and develops and has developed remote desktop and terminal server applications for that practice the Asserted Patents, including the Ignision Server product.

**Answer to Paragraph No. 11:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11, and therefore denies the same.

**Paragraph No. 12:** Strategic Technology Partners, LLC is a wholly-owned subsidiary of Aqua Connect and the assignee of the Patents-in-Suit. STP's principle place of business is also located at 18801 Ventura Blvd., Suite 310, Tarzana, CA 91356.

**Answer to Paragraph No. 12:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and therefore denies the same.

**Paragraph No. 13:** On information and belief, Parallels Inc. ("Parallels") is a Delaware corporation with a principle place of business at 110 110th Ave NE, #410 Bellevue, WA 98004. Parallels' registered agent for receipt of service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

**Answer to Paragraph No. 13:** Parallels admits that it is a Delaware corporation with a principal place of business at 110 110th Ave NE, #410 Bellevue, WA 98004 and that Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808 is a registered agent for receipt of service of process.

## JURISDICTION AND VENUE

**Paragraph No. 14:** This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**Answer to Paragraph No. 14:** Parallels admits that Plaintiffs purport to bring a patent infringement action under Title 35 of the United States Code, but Parallels specifically denies infringement. Parallels admits that jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a), but Parallels denies any liability thereunder.

**Paragraph No. 15:** Court has personal jurisdiction over Parallels because, among other reasons, Parallels has established minimum contacts with the forum state of Delaware.

**Answer to Paragraph No. 15:** Parallels admits that it is a Delaware corporation, but denies that it has committed any act of infringement in Delaware or any other state. Parallels denies the remaining allegations in Paragraph 15.

**Paragraph No. 16:** Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant is a resident of Delaware and has committed acts of infringement in this District.

**Answer to Paragraph No. 16:** Parallels denies that this venue is a convenient forum or that this judicial district is the only forum where venue could be proper. Parallels admits that it is a Delaware corporation but denies that it has committed any act of infringement in Delaware or any other state. Parallels denies the remaining allegations in paragraph 16.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. RE46,386

**Paragraph No. 17:** Plaintiffs incorporate by reference the foregoing paragraphs and further alleges as follows:

**Answer to Paragraph No. 17:** Parallels incorporates by reference its answers to the foregoing paragraphs.

**Paragraph No. 18:** The ‘386 Patent issued on May 2, 2017 and claims the benefit of Provisional Patent Application Serial No. 61/099,485, filed on September 23, 2008.

**Answer to Paragraph No. 18:** Parallels admits that the ’386 Patent appears on its face to have been issued on May 2, 2017 and to claim the benefit of Provisional Patent Application Serial No. 61/099,485.

**Paragraph No. 19:** The ‘386 Patent claims cover inventions including a computer implemented method for updating a user instance, the method comprising: creating at least one user computer context configured to be executed on a Mach-derived computing device comprising at least one computer processor, wherein each of the at least one user computer context is configured to incorporate an agent server; associating the agent server with an agent client, wherein the agent client and the agent server are configured to be executed on the Mach-derived computing device, but in separate processes and in separate Mach contexts; generating, by the agent server, data corresponding to an updated user instance, wherein the data corresponding to the updated user instance comprises user computer data, wherein the user computer data comprises at least one of: display data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touchpad data, keyboard data, mouse data, metadata, smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data; determining, by the agent server, that any portion of the user computer data has been updated; transferring the data corresponding to the updated user instance between the agent

server and the agent client via a computer system communication facility based on said determining, wherein said transferring comprises: transferring at least one of: the user computer data, or metadata corresponding to a shared memory, wherein said shared memory comprises the any portion of the updated user computer data, between the agent server and the agent client, wherein at least one of the user computer data or the metadata is transmitted via the computer system communication facility, wherein the computer system communication facility comprises at least one of: a socket, a file, a port, a shared computer memory, or a pipe; and transmitting the data corresponding to the updated user instance over a communications network to a remote computer system for update of the user instance based on the data corresponding to the updated user instance, wherein said transmitting comprises: transmitting at least one of the user computer data, or the metadata, over the communications network to the remote computer system for update of the user instance based on the updated user computer data or metadata.

**Answer to Paragraph No. 19:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19, and therefore denies the same.

**Paragraph No. 20:** Parallels has been and is now directly and indirectly infringing one or more claims of the '386 Patent in this judicial District and elsewhere in the United States.

**Answer to Paragraph No. 20:** Denied.

**Paragraph No. 21:** For example, Parallels directly infringes the '386 Patent, including but not limited to claim 1, by making, using, selling, offering for sale, and importing products, including but not limited to Parallels Access 3.2.0. Parallels Access 3.2.0 is representative of the

products accused, which encompass other Parallels products and product versions having similar features.

**Answer to Paragraph No. 21:** Denied.

**Paragraph No. 22:** The analysis herein cites to function names and other source code information derived with a disassembler program. Actual source code function names may be different.

**Answer to Paragraph No. 22:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22, and therefore denies the same.

**Paragraph No. 23:** Parallel Access performs a computer implemented method for updating a user instance (e.g. the environment of the user's desktop, applications and associated components that run the user's interface), the method comprising creating at least one user computer context (e.g. a user context) configured to be executed on a Mach-derived computing device comprising at least one computer processor (e.g. a computing device running the MacOS operating system), wherein each of the at least one user computer context is configured to incorporate an agent server (e.g. the prl_deskctl_agent program).

**Answer to Paragraph No. 23:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 24:** Parallels Access associates the agent server (e.g. the prl_deskctl_agent program) with an agent client (e.g. the prl_pm_service program), wherein the agent client and the agent server are configured to be executed on the Mach-derived computing device, but in separate processes and in separate Mach contexts (e.g. the prl_deskctl_agent in the user context and the prl_pm_service program in the system context).

**Answer to Paragraph No. 24:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 25:** Parallels Access generates by the agent server (e.g. the prl_deskctl_agent program), data corresponding to an updated user instance, wherein the data corresponding to the updated user instance comprises user computer data, wherein the user computer data comprises at least one of: display data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touchpad data, keyboard data, mouse data, metadata, smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data. For example, the Parallels Access "sub_1006d71c0" procedure is used for display data, image data, video data, streaming data, output data, etc., and the Parallels Access "sub_1000b2010," "sub_1000b3620," and "sub_1000b3ab0" procedures are used for functions including input data, keyboard data, touchpad data, mouse data.

**Answer to Paragraph No. 25:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 26:** Parallels Access determines by the agent server, that any portion of the user computer data has been updated. For example, the agent server (e.g. the prl_deskctl_agent program) determines that any portion of the user data has been updated, and performs processing of the data in the Parallels Access "sub_1006d71c0" procedure by a block callback when new frames are available for the user instance.

**Answer to Paragraph No. 26:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 27:** Parallels Access transfers the data corresponding to the updated user instance between the agent server and the agent client via a computer system communication facility (e.g. a socket system communication facility) a based on said determining, wherein said transferring comprises: transferring at least one of: the user computer data, or metadata corresponding to a shared memory, wherein said shared memory comprises the any portion of the updated user computer data, between the agent server and the agent client. For example, the data is transferred to the agent client (e.g. the prl_pm_service program), from the agent server (e.g. the prl_deskctl_agent program). User data is transferred via shared memory (e.g. in the Parallels Access "sub_100bbcbb0" and "sub_1008a9f70" procedures, using Posix shm_open shared memory). User data and metadata is also transferred via a socket (e.g. in the Parallels Access "sub_100728860" procedure, using socket "read" operations on the agent client, and Parallels Access "sub_100536f6d" procedure, using socket "read" operations on agent client).

**Answer to Paragraph No. 27:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 28:** In Parallels Access, at least one of the user computer data or the metadata is transmitted via the computer system communication facility (e.g. using the shared memory and socket), wherein the computer system communication facility comprises at least one of: a socket, a file, a port, a shared computer memory, or a pipe.

**Answer to Paragraph No. 28:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 29:** Parallels Access transmits the data corresponding to the updated user instance over a communications network to a remote computer system for update of the user instance based on the data corresponding to the updated user instance, wherein said transmitting comprises: transmitting at least one of the user computer data, or the metadata, over the communications network to the remote computer system for update of the user instance based on the updated user computer data or metadata. For example, data is transmitted from the agent client (e.g. the prl_pm_service program) over the network to the remote system via a web server implementation. (*See, e.g.*, "sub_10090ab70," which references log message "HttpServer" and "ServerImpl"; references to network communication function "QSocketNotifier" within the "prl_pm_service" program.)

**Answer to Paragraph No. 29:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 30:** Parallels has injured Plaintiffs and is liable to Plaintiffs for direct and indirect infringement of the '386 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c). Parallels has committed acts of infringement without license or authorization.

**Answer to Paragraph No. 30:** Denied.

**Paragraph No. 31:** As a result of Parallels' infringement of the '386 Patent, Plaintiffs had suffered harm and seeks monetary damages in an amount adequate to compensate for

infringement, but in no event less than a reasonable royalty for the use made of the invention by Parallels, together with interest and costs as fixed by the Court.

**Answer to Paragraph No. 31:** Denied.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 8,924,502**

**Paragraph No. 32:** Plaintiffs incorporate by reference each of the allegations in the foregoing paragraphs, and further allege as follows:

**Answer to Paragraph No. 32:** Parallels incorporates by reference its answers to the foregoing paragraphs.

**Paragraph No. 33:** The ‘502 Patent issued on December 30, 2014 and claims the benefit of Provisional Patent Application Serial No. 61/099,485, filed on September 23, 2008.

**Answer to Paragraph No. 33:** Parallels admits that the ’502 Patent appears on its face to have been issued on December 30, 2014 and to claim the benefit of Provisional Patent Application Serial No. 61/099,485.

**Paragraph No. 34:** The ‘386 Patent claims cover inventions including a method for transmitting and receiving data, the method comprising: creating a first context on a Mach-derived system comprising at least one processor, wherein the first context incorporates an agent server; creating a second context on the Mach-derived system, wherein the second context incorporates an agent client; wherein the agent client and the agent server are executed on the Mach-derived system, but in separate processes; receiving by the agent client the data over a network from a remote system for update of a user instance based on the data, wherein said receiving comprises: receiving at least one of user data, or metadata, over the network from the remote system for update of the user instance based on the updated user data or metadata; transferring the data to or from the agent server via a system communication facility, wherein said

transferring comprises: transferring at least one of: the user data, or metadata corresponding to a shared memory comprising the any portion of the updated user data, between the agent client and the agent server, and wherein at least one of the user data or the metadata is received via the system communication facility, wherein the system communication facility comprises at least one of: a socket, a file, a port, or a pipe; processing, by the agent server, the data corresponding to the updated user instance, wherein the data corresponding to the updated user instance comprises the user data, wherein the user data comprises at least one of: display data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touchpad data, keyboard data, mouse data, the metadata, smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data; and determining, by the agent server, that any portion of the user data has been updated; transferring the data to the agent client via a system communication facility based on said determining, wherein said transferring comprises: transferring at least one of: the user data, or metadata corresponding to a shared memory comprising the any portion of the updated user data, between the agent server and the agent client, wherein at least one of the user data or the metadata is transmitted via the system communication facility, wherein the system communication facility comprises at least one of: a socket, a file, a port, or a pipe; and transmitting from the agent client the data over the network to the remote system for update of the user instance based on the data, wherein said transmitting comprises: transmitting at least one of the user data, or the metadata, over the network to the remote system for update of the user instance based on the updated user data or metadata.

**Answer to Paragraph No. 34:** This paragraph states a legal conclusion to which no response is required. Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34, and therefore denies the same.

**Paragraph No. 35:** Parallels has been and is now directly and indirectly infringing one or more claims of the '386 Patent in this judicial District and elsewhere in the United States.

**Answer to Paragraph No. 35:** Denied.

**Paragraph No. 36:** For example, Parallels directly infringes the '386 Patent, including but not limited to claim 37, by making, using, selling, offering for sale, and importing products, including but not limited to Parallels Access 3.2.0. Parallels Access 3.2.0 is representative of the products accused, which encompass other Parallels products and product versions having similar features.

**Answer to Paragraph No. 36:** Denied.

**Paragraph No. 37:** The analysis herein cites to function names and other source code information derived with a disassembler program. Actual source code function names may be different.

**Answer to Paragraph No. 37:** Parallels lacks the knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37, and therefore denies the same.

**Paragraph No. 38:** Parallels products, including but not limited to the Parallels Access 3.2.0 product, practice a method for transmitting and receiving data according to the analysis below.

**Answer to Paragraph No. 38:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 39:** Parallels Access creates a first context (e.g. a user context) on a Mach-derived system comprising at least one processor (e.g. a computing device running the MacOS operating system), wherein the first context incorporates an agent server (e.g. the prl_deskctl_agent program).

**Answer to Paragraph No. 39:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 40:** Parallels Access creates a second context (e.g. the system context) on the Mach-derived system, wherein the second context incorporates an agent client (e.g. the prl_pm_service program). The agent client and the agent server are executed on the Mach-derived system, but in separate processes (e.g. the prl_deskctl_agent in the user context and the prl_pm_service program in the system context).

**Answer to Paragraph No. 40:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 41:** Parallels Access receives by the agent client (e.g. the prl_pm_service program) the data over a network from a remote system (e.g. a separate computing device that communicates over a network using the TCP/IP protocol to the system running the agent server and agent client processes) for update of a user instance (e.g. the environment of the user's desktop, applications and associated components that run the user's interface) based on the data. For example, the Parallels Access "sub_100c90480" procedure listens for and handles incoming TCP/IP connections over the network, and the Parallels Access

"sub_100b5cf70" procedure is used to set up the agent client for notifications that data has been received over a network from a remote system. Data is then received by the agent client.

**Answer to Paragraph No. 41:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 42:** In Parallels Access, receiving comprises receiving at least one of user data, or metadata, over the network from the remote system for update of the user instance based on the updated user data or metadata, as described below.

**Answer to Paragraph No. 42:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 43:** Parallels Access transfers the data to or from the agent server via a system communication facility, wherein said transferring comprises: transferring at least one of: the user data, or metadata corresponding to a shared memory comprising the any portion of the updated user data, between the agent client and the agent server, wherein at least one of the user data or the metadata is received via the system communication facility, wherein the system communication facility comprises at least one of: a socket, a file, a port, or a pipe. For example, the agent server (e.g. the prl_deskctl_agent program) connects with the agent client (e.g. the prl_pm_service program) using a system communication (e.g. a socket, or alternately shared memory). (*See, e.g.*, the Parallels Access "sub_100806d90" procedure, using a "listen" socket operation.) The transferring also comprises transferring metadata corresponding to a shared memory comprising a portion of the updated user data. (*See, e.g.*, the Parallels Access "sub_100806d90" procedure, using shared memory in a Unix socket, the Parallels Access

"sub_100bbcbb0" and "sub_1008a9f70" procedures, using Posix shm_open shared memory.) Once connected, the socket and the shared memory will be used to transfer the updated user data from the user instance.

**Answer to Paragraph No. 43:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 44:** Parallels Access processes, by the agent server (e.g. the prl_deskctl_agent program) the data corresponding to the updated user instance. For example, the processing of the data is performed in the Parallels Access "sub_1006d71c0" procedure by a block callback when new frames are available for the user instance. The new frames will contain updated metadata information about the user instance and image data.

**Answer to Paragraph No. 44:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 45:** In Parallels Access, the data corresponding to the updated user instance comprises the user data, wherein the user data comprises at least one of: display data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touchpad data, keyboard data, mouse data, the metadata, smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data. For example, the Parallels Access "sub_1006d71c0" procedure is used for display data, image data, video data, streaming data, output data, etc., and the Parallels Access "sub_1000b2010," "sub_1000b3620,"

and "sub_1000b3ab0" procedures are used for functions including input data, keyboard data, touchpad data, mouse data.

**Answer to Paragraph No. 45:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 46:** Parallels Access determines, by the agent server, that any portion of the user data has been updated. The agent server (e.g. the prl_deskctl_agent program) determines that any portion of the user data has been updated, and determines what portion of the user data has been updated, and also performs processing of the data. The processing of the data is performed, for example, in the Parallels Access "sub_1006d71c0" procedure by a block callback when new frames are available for the user instance.

**Answer to Paragraph No. 46:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 47:** Parallels Access transfers the data to the agent client (e.g. the prl_pm_service program) via a system communication facility (e.g. a socket or shared memory) based on said determining, wherein the transferring comprises transferring at least one of the user data, or metadata corresponding to a shared memory comprising the any portion of the updated user data, between the agent server and the agent client, wherein at least one of the user data or the metadata is transmitted via the system communication facility, wherein the system communication facility comprises at least one of: a socket, a file, a port, or a pipe. (*See, e.g.*, the Parallels Access "sub_100bbcbb0" and "sub_1008a9f70" procedures, using Posix shm_open shared memory, the Parallels Access "sub_100728860" procedure, using socket "read"

operations on agent client, and the Parallels Access "sub_100536f6d" procedure, using socket "read" operations on the agent client.)

**Answer to Paragraph No. 47:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 48:** Parallels Access transmits from the agent client (e.g. the prl_pm_service program) the data over the network to the remote system for update of the user instance based on the data, wherein said transmitting comprises transmitting at least one of the user data, or the metadata, over the network to the remote system for update of the user instance based on the updated user data or metadata. For example, the remote system connects over a network connection using the TCP/IP protocol to the agent client (e.g. the "prl_pm_service" program). Data is transmitted from the agent client (e.g. the "prl_pm_service" program) over the network to the remote system via a web server implementation. (*See, e.g.*, "sub_10090ab70," which references log message "HttpServer" and "ServerImpl"; references to network communication function "QSocketNotifier" within the "prl_pm_service" program.)

**Answer to Paragraph No. 48:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Parallels denies the allegations of this paragraph.

**Paragraph No. 49:** Parallels has injured Plaintiffs and is liable to Plaintiffs for direct and indirect infringement of the '502 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c). Parallels has committed acts of infringement without license or authorization.

**Answer to Paragraph No. 49:** Denied.

**Paragraph No. 50:** As a result of Parallels' infringement of the '502 Patent, Plaintiffs had suffered harm and seeks monetary damages in an amount adequate to compensate for infringement, but in no event less than a reasonable royalty for the use made of the invention by Parallels, together with interest and costs as fixed by the Court.

**Answer to Paragraph No. 50:** Denied.

## PRAYER FOR RELIEF

Parallels denies that Plaintiffs are entitled to any of the relief requested in the Complaint, or to any relief whatsoever in connection with the patents-in-suit.

## JURY TRIAL DEMANDED

Parallels admits that Plaintiffs purport to demand a jury trial.

## DEFENDANT'S AFFIRMATIVE AND ADDITIONAL DEFENSES

Parallels asserts the following affirmative and additional defenses to the allegations in the Complaint:

### First Defense
### (Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted.

### Second Defense
### (Invalidity)

Upon information and belief, the '386 and '502 Patents are invalid because they fail to meet the conditions specified in 35 U.S.C. § 101, *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 132 and/or 251. Parallels incorporates by reference, as if fully stated herein, its declaratory judgment counterclaims of invalidity for the '386 and '502 patents.

**<u>Third Defense</u>**
**(Non-Infringement)**

Parallels has not and does not infringe the ‘386 and ‘502 Patents, either directly or indirectly, literally, or under the doctrine of equivalents.

**<u>Fourth Defense</u>**
**(Ensnarement)**

Plaintiffs’ claims are barred in whole or in part by the doctrine of ensnarement.

**<u>Fifth Defense</u>**
**(Estoppel)**

Plaintiffs are estopped, based on statements, representations, amendments and admissions made during prosecution of the patent applications resulting in the asserted patents, from asserting any interpretation of any valid, enforceable claims of the asserted patents that would be broad enough to cover any accused product alleged to infringe the asserted patent, either literally or by application of the doctrine of equivalents.

**<u>Sixth Defense</u>**
**(28 U.S.C. § 252)**

Plaintiffs’ claims for the ’386 patent are barred in whole or in part by absolute and equitable intervening rights under 28 U.S.C. § 252.

**<u>Seventh Defense</u>**
**(35 U.S.C. § 287)**

Any claim for damages for patent infringement by Plaintiffs is limited by 35 U.S.C. § 287 to those alleged damages occurring only after sufficient notice of infringement.

**<u>Eighth Defense</u>**
**(28 U.S.C. § 285)**

Parallels has engaged in all of its activities in good faith, and Plaintiffs cannot prove that this is an exceptional case justifying an award of attorneys' fees against Parallels pursuant to 28 U.S.C. § 285.

**<u>Ninth Defense</u>**
**(Injunctive Relief Not Available)**

Neither preliminary nor permanent injunctive relief are available to Plaintiffs under the legal standards for injunctions, and a compulsory license would be legal error, because, among other things, Plaintiffs cannot show irreparable harm, and the balance of hardships and public interest do not favor an injunction in this case. *See eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2006).

**<u>Tenth Defense</u>**
**(Lack of Standing)**

One or both plaintiffs lack sufficient standing.

**<u>RESERVATION OF RIGHTS</u>**

Parallels reserves the right to assert any additional defenses in the event that discovery or further investigation reveals the existence of such defenses.

## COUNTERCLAIMS

1. Pursuant to Fed. R. Civ. P. 13, Counter-Plaintiff Parallels, Inc. complains and alleges against Counter-Defendants Aqua Connect, Inc. and Strategic Technology Partners LLC (collectively "Plaintiffs"), as follows:

2. This Counterclaim is an action for a declaration of patent non-infringement, patent invalidity, and unenforceability arising under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*., and the patent laws of the United States, 35 U.S.C. § 1, *et. seq*.

## PARTIES

3. Parallels, Inc. is a Delaware corporation with a principal place of business at 110 110th Ave NE, #410 Bellevue, WA 98004.

4. On information and belief based on its allegations in the Complaint, Aqua Connect, Inc. is a Nevada corporation with a principal place of business and headquarters at 18801 Ventura Blvd., Suite 310, Tarzana, CA 91356.

5. On information and belief based on its allegations in the Complaint, Strategic Technology Partners, LLC is a wholly-owned subsidiary of Aqua Connect and the assignee of the Patents-in-Suit. STP's principal place of business is also located at 18801 Ventura Blvd., Suite 310, Tarzana, CA 91356.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Plaintiffs, *inter alia*, because Plaintiffs have submitted to personal jurisdiction herein by filing their Complaint in this Court.

7. Venue is proper in this judicial district because the declaratory relief sought is a compulsory counterclaim to claims filed by Plaintiffs in this case and pursuant to 28 U.S.C. §§ 1367 and 1391(b).

8. Plaintiffs allege in Paragraph 1 of the Complaint that they are assignees of U.S. Patent Nos. 8,924,502 ("the '502 patent") and RE46,386 ("the '386 patent") (collectively, "Asserted Patents").

9. Based on the allegations in Plaintiffs' Complaint and Parallels' denials and additional and affirmative defenses, an actual controversy has arisen and now exists between the parties as to the validity, enforceability, and infringement of the Asserted Patents.

10. This Court has subject matter jurisdiction over these counterclaims based on 28 U.S.C. §§ 1331, 1338, 2201-02 and under Fed. R. Civ. P. 13(a) in that this is a compulsory counterclaim to the allegations of the Complaint.

**NONINFRINGEMENT OF THE ASSERTED PATENTS**

11. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

12. Parallels does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '502 or '386 patents. For example, **prl_deskctl_agent** transmits updated data corresponding to a user instance, e.g., updated display data, over the network without transmitting it to **prl_pm_service**.

13. Plaintiffs do not accuse of infringement, literally or under the doctrine of equivalents, **prl_deskctl_agent** transmitting updated data corresponding to a user instance, e.g., updated display data, over the network without transmitting it to **prl_pm_service**.

14. Parallels' investigation is ongoing, and therefore Parallels reserves the right to supplement and amend its noninfringement positions based on additional information obtained through discovery or other means and as appropriate in response to the Court's determination of issues.

**INVALIDITY OF THE ASSERTED PATENTS**

15. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

**Sections 102 and 103**

16. The claims of the ’502 and ’386 patents are invalid for failure to comply with 35 U.S.C. §§ 102 and 103.

17. Computer program products for updating a user session were conventional before the alleged invention of the Patents-in-Suit. In the prior art, it was known to persons of ordinary skill in the art to implement remote desktop environments that update the graphical display of user sessions and transmit the output to remote client sessions. *See, e.g.*, ’502 Patent at 2:1-28.

18. For example, commercial products were available implement these terminal server environments, such as LogMeIn and GoToMyPC by 2007.

19. Although most commercial products supported Windows computing environments around 2007, at least LogMeIn was previewed as operating on the Mac OS X environment no later than July 2007. *See, e.g.*, http://appletothecore.me/files/logmein.php.

20. The purported novelty and non-obviousness of the Patents-in-Suit originated from alleged problems arising from differences between a Windows environment and a Mach-based environment such as Mac OS X encountered when implementing a remote desktop environment. For example, the applicant stated in the Response to Final Rejection mailed June 30, 2015 in the reissue application leading to the ’386 reissue patent:

Furthermore, Applicant's claimed invention evidences several clear cases of evidence of secondary indicia of nonobviousness as set forth by the US Supreme Court in its decision in *Graham v. John Deere*. First, the structure of the Mach-derived computer system, such as including Mach contexts, as noted above, is distinct from the kernel structure found in DOS/Win/UNIX based systems, and therefore those systems are not faced with the same challenge inherent in Mach-derived systems of how to cross a Mach context boundary, i.e., a user computer context boundary within a computing device to control one or more user input/output devices. That problem, which the claimed invention computing device solves, is a uniquely Mach-derived computer system issue, for which there has been a long felt and unmet need, prior to Applicant's invention, see for example the Mac Internals document previously submitted and discussed in the previous declaration and during the Examiner interview, which is a well established secondary objective indicia of nonobviousness. Second, as a result of the solution of the

21. The alleged inventions of the Asserted Patents purport to solve the problem of needing to cross Mach context boundaries by splitting a KVM agent into a client and a server operating in separate contexts.

22. However, it was well-known to persons of ordinary skill in the art before the priority date of the Patents-in-Suit to cross Mach context boundaries by splitting software processes such as agents into a client and server operating in separate contexts. For example, Apple published Technical Note TN2083 no later than January 3, 2006, entitled "Daemons and Agents." ("TN2083"). It teaches:

> The correct solution to this problem is to split your program into multiple components, each specialized for a particular role. So, you might have a daemon for managing the global state and an agent operating on behalf of each of the logged in users. If the daemon needs the user to answer a question, it signals all the agents and the agents use local knowledge to decide what to do. For example, the agent might behave differently depending on whether it's running in a GUI or non-GUI login session, or whether the GUI session is active (that is, using the console in a fast user switched environment).

https://developer.apple.com/library/content/technotes/tn2083/_index.html.

23. TN2083 also teaches that the client / server model should be used in this scenario, and that communication between the processes should be performed using inter-process communication (IPC) such as UNIX sockets:

> If you do split your program into multiple components, try to use the client/server model. Specifically, remember that clients connect to servers, and not the other way around. This might sound obvious, but it's easy to forget this point and find yourself in the weeds.
>
> In this context, a server is the background program that contains the global state that's being shared, while the clients are the programs that want to access that state. The server might be an agent (if all of the clients run in the same login session), or it might be a daemon (if it handles clients from multiple login sessions, or it handles other daemons as clients); the key*f* point is that there is a one-to-many relationship between the server and its clients.
>
> In this design, the server should not try to discover or connect to the clients. Rather, the clients should connect to the server. This approach is a good match for the common inter-process communication (IPC) APIs. For example, if you're using UNIX domain sockets, it's easy for a daemon to listen on a single UNIX domain socket and have the clients connect to that socket. It's also easy for the server to handle a client disconnecting (either because it quit or because it died unexpectedly). If you do things the other way around, things start to get messy.

24. Thus, the claims of the Patents-in-Suit are invalid under at least 35 U.S.C. § 103. For example, the claims are rendered obvious by U.S. Patent Application Publication No. 2009/0080523 ("McDowell") filed on September 24, 2007, in view of TN2083. McDowell is prior art to the Patents-in-Suit under at least 35 U.S.C. § 102(e) because the application that resulted in the McDowell publication was filed on September 24, 2007. Indeed, the patent examiner cited McDowell during examination of the '386 patent. TN2083 is prior art to the Patents-in-Suit under at least 35 U.S.C. § 102(b) because it was published no later than January 3, 2006 and November 5, 2007. It would have been obvious to one of ordinary skill in the art to implement the remote user interface of McDowell with the Mach-derived operating system of TN2083.

25. McDowell in view of TN2083 discloses each and every element of the claims of the Patents-in-Suit. For example, McDowell discloses that "Frames of user interface graphical data can be remotely rendered at a client during a remote session with a server by providing graphical data commands to the client." McDowell at Abstract. TN2083 further implements a background program on a Mach derived kernel by using daemons (e.g., agent clients) and agents (e.g., agent servers) in a client / server model. A person of ordinary skill in the art would have been motivated to apply the solutions taught by TN2083 to overcome any problems that would arise by trying to implement McDowell on a computer running Mac OS X operating system.

26. No claim in either the '502 patent or the '386 patent is entitled to the effective filing date of any prior application because no claim is disclosed in any such prior application in the manner required by 35 U.S.C. §§112, 120 as shown below. Accordingly, U.S. Pat. Pub. No. 2010/0077055, published March 25, 2010, and Aqua Connect's products, including version 3.0 and later, are prior art to every claim in both patents under 35 U.S.C. § 102(b). Every asserted claim in both patents is invalid in light of each of U.S. Pat. Pub. No. 2010/0077055 and Aqua Connect version 3.0, alone or in combination with the other references discussed above.

**Sections 112, 132 and 251(a)**

27. The claims of the '502 and '386 patents are invalid for failure to comply with 35 U.S.C. §§ 112, 132 and 251(a).

28. Each of the claims of the '502 and '386 patents is invalid as indefinite at least for using the terms "context," "Mach context," and/or "Mach-derived" which are indefinite in the context of these claims, specifications and file history.

29. Each of the claims of the ’502 and ’386 patents is invalid as lacking written description, not enabled, and for violating the prohibition against new matter for at least the following reasons.

30. First, each claim of the ’502 and ’386 patents is invalid for claiming the alternative that metadata, instead of the data itself, could be transmitted over the network. The specifications and applications disclose that metadata can be transmitted between the agent client and agent server within the host system. Ex. 1 (’613 application) at ¶¶ 19-20. The specifications and applications do not disclose or enable transmitting only metadata over the network between the host system and the user’s remote computer. The alternative that metadata could be transmitted over the network instead of the data itself was improperly added by amendment in 2013 and 2014. *See* Ex. 2 (July 11, 2013 Amendment in ’093 patent file history) at claim 14 (issued claim 1); Ex. 3 (March 5, 2014 Amendment in ’502 patent file history) at claim 14 (issued claim 1). Accordingly, each of the claims is invalid for claiming that undisclosed alternative, and none of the claims is entitled to the effective filing date of the ’613 application.

31. Second, each claim of the ’502 and ’386 patents is invalid for claiming alternative data operations that are not disclosed in the specifications or applications and, in fact, are the opposite of what is disclosed. The specifications and applications disclose that output data (e.g., display data) can be generated by an agent server, transferred to an agent client, and transmitted to a remote computer, and that input data (e.g., keyboard data) takes the reverse path. However, for example, claim 1 of the ’386 patent claims the alternative and undisclosed data operation of input data/keyboard data taking the data path disclosed only for output data. *See, also,* ’386 patent at 8:63-9:62 (claim 8), 10:62-11:58 (claim 25), 11:63-12:65 (claim 27); ’502 patent at 7:41-8:16 (claim 1), 8:31-9:14 (claim 8), 10:14-65 (claim 25), 11:3-57 (claim 27), 14:20-15:8

(claim 38). Other claims, for example claim 36 of the ’502 patent, have the same problem but in reverse, because they claim “output data” taking the path disclosed only for “input data.” ’502 patent at 12:46-13:17 (claim 36), 14:20-15:8 (claim 38). The specifications and applications do not disclose or enable these claimed data operations. These claimed alternative data operations were improperly added by amendment in 2013 and 2014 during prosecution. *See, e.g.* , Ex. 2 (July 11, 2013 Amendment in ’093 patent file history) at claim 14 (issued claim 1); Ex. 4 (May 28, 2014 Amendment in ’502 patent file history) at claim 14 (issued claim 1). Accordingly, each of the claims is invalid for claiming that undisclosed and non-enabled alternative, and none of the claims is entitled to the effective filing date of the ’613 application.

32. Third, each of claims 4 and 38 of the ’502 patent and claim 4 of the ’386 patent is invalid for claiming a single client agent in communication with multiple agent servers. The specifications and applications disclose only a one-to-one relationship between an client-server agent pair. Ex. 1 (613 application) at Fig. 1, ¶ 8. However, for example, claim 4 of the ’386 patent claims “the agent client communicates with two or more agent servers.” ’386 patent at 8:54-55 (claim 4); *see also* ’502 patent at 8:23-24 (claim 4), 14:28-31, 61-62 (claim 38). This subject matter was added to the claims by amendment in 2011 and 2014. *See* Ex. 5 (May 16, 2011 Amendment in ’093 patent file history) at claim 17 (issued as claim 4); Ex. 4 (May 28, 2014 Amendment in ’502 patent file history) at claims 17 and 51 (issued as claims 4 and 38). Accordingly, each of the claims is invalid for claiming that undisclosed and non-enabled alternative of a one-to-many agent client-server relationship, and none of the claims is entitled to the effective filing date of the ’613 application.

33. Fourth, each of the claims in the ’502 and ’386 patents is invalid for claiming a “context” or “Mach context” to the extent these limitations (or any other limitations) incorporate

a Mach-derived or bootstrap context limitation. The specifications and applications disclose a protocol independent architecture that adapts to different operating system architectures, without any discussion of Mach-derived or bootstrap concepts. Ex. 1 (613 application) at Abstract, ¶ 16. These concepts were improperly added to the claims by amendment and/or argument during prosecution and reissue. Accordingly, each of the claims is invalid for claiming those undisclosed concepts, and none of the claims is entitled to the effective filing date of the ’613 application.

**Sections 115, 116, and 251(b)**

34. The claims of the ’502 and ’386 patents are invalid for failure to comply with 35 U.S.C. § 115, 116, 251(b).

35. The ’386 patent is a reissue of U.S. Patent No. 8,549,093 (“the ’093 patent”).

36. The ’386 patent was filed on February 27, 2014 as U.S. Patent Application Serial No. 14/191,450 (“the ’450 application”).

37. The ’093 patent was filed on September 23, 2009 as U.S. Patent Application Serial No. 12/586,613 (“the ’613 application”).

38. The ’093 patent issued on October 1, 2013.

39. A true and correct copy of the ’613 application is attached as Ex. [1].

40. A true and correct copy of the Declaration and Power of Attorney accompanying the ’613 application is attached as Ex. [6].

41. The’613 application was filed on behalf of Joseph Chyam Cohen by his attorneys.

42. The ’450 application was accompanied by a “Reissue Application Declaration by the Assignee,” dated 2/18/14, which identified the assignee as Strategic Technology Partners,

LLC and which was executed by Efraim Cohen. A true and correct copy of that declaration is attached as Ex. [7] ("the First Assignee Declaration").

43. Efraim Cohen is not the named inventor of either the '093 patent or the '386 patent.

44. The First Assignee Declaration stated that reissue was sought because the '093 patent was "inoperative or invalid" based on the failure to include in the claims the limitation "in separate contexts." *Id.* at 2-3.

45. The '450 application included a preliminary amendment. A true and correct copy of that preliminary amendment is attached as Ex. [8].

46. That preliminary amendment added to all independent claims an "in separate contexts" claim limitation and fixed other purported typographical errors. Ex. [8], Preliminary Amendment dated Feb. 27, 2014 at 2-14, 15.

47. The applicant stated in the remarks that accompanied the amendment: "[a]ll claim amendments narrow the scope of breadth of the claims (or correct minor typographic errors in the patent)." *Id.* at 15.

48. On December 10, 2014, the Examiner issued an non-final Office Action which included two relevant rejections related to the First Assignee Declaration.

49. The Examiner first found the typographical errors were actually broadening amendments, such that a declaration by the assignee did not comply with 35 U.S.C. § 251. Ex. [9], Dec. 10, 2014 Rejection at 4.

50. The examiner stated: "The application for reissue may be made and sworn to by the assignee of the entire interest only if the application does not seek to enlarge the scope of the claims of the original patent or [exception related to 37 CFR 1.46]." *Id.*

51. The Examiner also found that the First Assignee Declaration was defective for indicating that 37 CFR 1.46 ("Application for Patent by an Assignee . . .") applied. *Id.* at 4-5.

52. On March 24, 2015, the applicant submitted a second amendment. Ex. [10], March 24, 2015 Amendment at 2-13.

53. In its remarks, applicant again insisted that "[a]ll Claim amendments narrow the scope of the breadth of the claims (or correct minor typographical errors introduced into the patent's claims at time of final data capture.)" *Id.* at 14.

54. Applicant repeated those arguments with respect to the Examiner's first rejection of the First Assignee Declaration. *Id.* at 15-16 ("Thus, since the claim was not broadened in any way, since the amendments were merely to correct typographic errors, Applicants respectfully request that the objection of Paragraph 8 be withdrawn.").

55. Applicant also submitted a second assignee declaration omitting the reference to 37 CFR 1.46 to overcome the Examiner's rejection related to that erroneous designation. *Id.* at 16; Ex. [11], undated Reissue Application Declaration by the Assignee (the "Second Assignee Declaration") at 2.

56. The applicant did not check the top box of the form of that Second Assignee Declaration, relating to 37 C.F.R. § 1.46. *Id.* The Second Assignee Declaration correctly indicated that 37 C.F.R. § 1.46 did not apply.

57. The Second Assignee Declaration was again executed by Efraim Cohen on behalf of Strategic Technology Partners LLC. *Id.* at 2.

58. The Examiner subsequently did not issue any further rejections based on the reissue declarations.

59. Joseph Cohen never executed an oath under 35 U.S.C. § 251 during the reissue proceedings.

60. On August 4, 2016, two years and 10 months after the ’093 patent issued, and in response to a final rejection by the Examiner on the merits, applicant submitted a request for continued examination with additional amendments. A true and correct copy of that request and amendment is attached as Ex. [12] (RCE amendment).

61. The RCE amendment sought to broaden all independent claims by reciting that the claims also could be practiced – as an alternative to using one of the four previously prescribed means – by using “a shared computer memory.” *See, e.g.*, Ex. [12], RCE at 3.

62. Claim 1 was amended to recite “wherein the computer system communication facility comprises at least one of: a socket, a file, a port, a shared computer memory, or a pipe.” *Id.*

63. The amendment added “a shared computer memory” to the options listed in claim 1.

64. By this amendment, an infringement of the claim would occur not only if an accused system had a “computer system communication facility” that comprised “a socket, a file, a port, or a pipe” but now also occur if an accused system had a “computer system communication facility” that comprised “a shared computer memory.”

65. The claims of the ’386 patent issued with “a shared computer memory” added as an option for the “computer system communication facility” recited in each independent claim. ’386 patent at 8:16-37 (claim 1), 9:28-51 (claim 8), 11:12-23 (claim 25), 12:15-30 (claim 27) (each claiming “a shared memory” as an alternative communication facility).

66. Literal infringement of the claims of the ’093 patent could occur only if an accused system had a communication facility that comprised “a socket, a file, a port, or a pipe.” Literal infringement of the claims of the ’386 patent. Literal infringement of the claims of the ’386 patent can occur if an accused system has a communication facility that comprises “a shared computer memory.”

67. Each of the claims of the ’386 patent was broadened during reissue to include the option of using “a shared computer memory” as the claimed communication facility.

68. The broadening of the claims during reissue of the ’386 patent required a declaration from the named inventor, Joseph Cohen. 35 U.S.C. §§ 115, 116, 251. Because the claims are not supported by a proper broadening declaration, they are invalid.

**Section 251(d)**

69. The claims of the ’386 patent are further invalid under 35 U.S.C. § 251(d).

70. Applicant first submitted the amendment to add “a shared computer memory” as an option to the claims on August 4, 2016. Ex. [12], RCE at 3.

71. Applicant did not attempt to broaden the claims prior to August 4, 2016.

72. Applicant did not attempt to put the public on notice that it might broaden the claims prior to August 4, 2016.

73. Accordingly, the applicant’s submission of broader claims was time barred by 35 U.S.C. § 251(d) and the claims are therefore invalid on this additional basis.

**FIRST COUNTERCLAIM**
**(Declaration of Non-Infringement of the ’502 Patent)**

74. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

75. Parallels does not infringe and has not infringed, directly or indirectly, willfully or otherwise, any valid and enforceable claim of the ’502 patent, either literally or under the doctrine of equivalents.

76. Plaintiffs are precluded under the doctrines of prosecution history estoppel and ensnarement from asserting or construing, whether literally or by the doctrine of equivalents, any claim of the ’502 patent in a way that would read upon any product made, used, sold, offered for sale, or imported by Parallels.

77. As set forth above, an actual and justiciable controversy exists between Parallels and Plaintiffs as to infringement of the ’502 patent.

78. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Parallels requests that this Court enter a judgment that Parallels does not infringe, under any theory of infringement, any valid claim of the ’502 patent.

**SECOND COUNTERCLAIM**
**(Declaration of Invalidity of the ’502 Patent)**

79. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

80. The claims of the ’502 patent are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, and/or 132.

81. As set forth above, an actual and justiciable controversy exists between Parallels and Plaintiffs as to whether the claims of the ’502 patent are valid.

82. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Parallels requests that this Court enter a judgment that the claims of the ’502 patent are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, and/or 132.

**THIRD COUNTERCLAIM**
**(Declaration of Non-Infringement of the ’386 Patent)**

83. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

84. Parallels does not infringe and has not infringed, directly or indirectly, willfully or otherwise, any valid and enforceable claim of the ’386 patent, either literally or under the doctrine of equivalents.

85. Plaintiffs are precluded under the doctrines of prosecution history estoppel and ensnarement from asserting or construing, whether literally or by the doctrine of equivalents, any claim of the ’386 patent in a way that would read upon any product made, used, sold, offered for sale, or imported by Parallels.

86. As set forth above, an actual and justiciable controversy exists between Parallels and Plaintiffs as to infringement of the ’386 patent.

87. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Parallels requests that this Court enter a judgment that Parallels does not infringe, under any theory of infringement, any valid claim of the ’386 patent.

**FOURTH COUNTERCLAIM**
**(Declaration of Invalidity of the ’386 Patent)**

88. Parallels repeats and realleges and incorporates herein the foregoing responses and allegations.

89. The claims of the ’386 patent are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 132, and/or 251.

90. As set forth above, an actual and justiciable controversy exists between Parallels and Plaintiffs as to whether the claims of the ’386 patent are valid.

91. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, Parallels requests that this Court enter a judgment that the claims of the ’386 patent are invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 132, and/or 251.

**JURY DEMAND**

Parallels requests a jury trial on all claims and defenses so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Parallels requests judgment in its favor and against Plaintiffs as follows:

(i) Plaintiffs take nothing by way of their Complaint;

(ii) The Court enter judgment in favor of Parallels and against Plaintiffs, thereby dismissing the Complaint in its entirety, with prejudice, and deny Plaintiffs all requested relief;

(iii) The Court declare that Parallels has not infringed and does not infringe, literally or under the doctrine of equivalents, directly or indirectly, willfully or otherwise, any claim of the ’386 and ’502 Patents;

(iv) The Court declare and order that the ’386 and ’502 Patents are invalid and/or unenforceable;

(v) That Plaintiffs’ request for injunctive relief against Parallels be denied;

(vi) The Court declare that this case is exceptional, entitling Parallels to its attorneys’ fees under 35 U.S.C. § 285, and award Parallels its reasonable attorneys’ fees;

(vii) All costs be taxed against Plaintiffs; and

(viii) Parallels be granted such other and further relief as the Court deems just and proper.

Dated: June 1, 2018

DLA Piper LLP (US)

*/s/ Denise S. Kraft*

Denise S. Kraft (DE Bar No. 2778)
Brian A. Biggs (DE Bar No. 5591)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Tel: (302) 468-5700
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Defendant Parallels Inc.*

OF COUNSEL:

Brian K. Erickson (*pro hac vice*)
DLA Piper LLP (US)
401 Congress Avenue, Suite 2500
Austin, Texas 78701-3799
Tel: (512) 457-7000
Fax: (512) 457-7001
brian.erickson@dlapiper.com

Andrew N. Stein (*pro hac vice forthcoming)*
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel: (202) 799-4000
Fax: (202) 799-5000
andrew.stein@dlapiper.com